UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| PEDRO TIEMPO GARCIA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 2:13-CV-226 |
| | § | |
| G. CURRIE, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION**
**ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In this prisoner civil rights action, Plaintiff Pedro Tiempo Garcia complains that he was held in a dry isolation cell for two days, and punitive segregation for thirty-eight days, without a disciplinary hearing, in violation of his due process rights, and also, in violation of his Eighth Amendment right to be free from cruel and unusual punishment.

Pending is Defendants' motion for summary judgment to dismiss Plaintiff's lawsuit for failure to state cognizable constitutional claims. (D.E. 36). Plaintiff has filed two responses in opposition. (D.E. 40, D.E. 45). For the reasons stated herein, it is respectfully recommended that Defendants' motion for summary judgment be granted, and that Plaintiff's claims be dismissed with prejudice.

## I. Jurisdiction.

The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## II. Procedural background.

Plaintiff is an inmate in the Texas Department of Criminal Justice, Criminal Institutions Division (TDCJ-CID), and he is currently confined at the McConnell Unit in Beeville, Texas.

On July 24, 2013, Plaintiff filed his original complaint complaining that on April 13, 2013, he was falsely charged with attempting to smuggle contraband into the McConnell Unit. (D.E. 1, p. 4). While exiting the prison visitation area, Plaintiff was seized by Captain Rodriguez and Lieutenant Mireles upon suspicion of swallowing balloons containing contraband. *Id.* He was taken to the infirmary and placed in dry cell isolation so that prison officials might obtain and search his bodily waste. *Id.* Plaintiff was stripped of his clothing and given only a paper gown to wear for the next forty-four hours. *Id.* at 6. Plaintiff was denied a mattress, blanket, and other basic necessities, such as toilet paper, and given only prunes and peanut butter sandwiches to eat, despite the fact that he is allergic to peanut butter. *Id.* Plaintiff named as defendants Senior Warden Gary L. Currie; Assistant Warden Matt Barber; Captain B. Rodriguez; and (4) Lieutenant J. Mireles as defendants. *Id.* at. 7. Plaintiff alleged that his placement in the dry cell isolation violated his due process rights, and that the conditions of confinement in that cell violated the Eighth Amendment.

On September 9, 2013, Defendants filed their Answer and raised the affirmative defense of qualified immunity. (D.E. 8). Defendants also claimed that Plaintiff's claims against them in their official capacities for money damages were barred by the Eleventh Amendment. *Id.* at 4.

On December 16, 2013, Plaintiff was granted leave to amend his complaint to add Warden Carol Monroe as a defendant.[1] (D.E. 23, D.E. 24).

On January 15, 2014, Defendants filed an Answer to Plaintiff's amended complaint. (D.E. 26).

On May 16, 2014, Defendants Warden Currie, Warden Monroe, Warden Barber, Captain Rodriguez, and Lieutenant Mireles (hereinafter collectively the "Defendants") filed the instant motion for summary judgment. (D.E. 36).

On June 18, 2014, Plaintiff filed a second motion to amend his complaint. (D.E. 40). The Court granted the motion and also construed it to be a response in opposition to Defendants' summary judgment motion. (D.E. 42).

On July 9, 2014, Defendants moved for reconsideration of the July 9, 2014 order allowing Plaintiff to amend his complaint on the grounds that Plaintiff was attempting to add new defendants and new claims. (D.E. 43). On July 11, 2014, Defendants' motion to reconsider was granted in part and Plaintiff was advised that his motion to amend was limited to his claims against the five named Defendants. (D.E. 44).

On July 31, 2014, Plaintiff filed a third motion for leave to amend his claims. (D.E. 45). On August 12, 2014, the motion was granted to the extent Plaintiff intended for the pleading to serve as a supplemental response to the motion for summary

[1] In his first motion to amend complaint, Plaintiff also sought to add as defendants Officer Buentello and Officer Galvan alleging they had violated his rights by physically placing him in the dry isolation cell. (D.E. 19). Plaintiff was denied leave to add these two officers because they were simply following orders and had no authority to challenge Plaintiff's placement in the dry isolation cell or to have him released from dry cell isolation. (*See* D.E. 23).

judgment, and denied to the extent Plaintiff intended to add new claims or new defendants.

**III. Evidence offered.**

In support of their motion for summary judgment, Defendants offer the TDCJ Emergency Action Center Incident Records generated from the April 13, 2013 incident and identified as incident numbers I-05073-04-13 (for Plaintiff) and I-05068-04-13 (for Plaintiff's alleged accomplice, Hector Garcia). (See D.E. 36-2, pp. 2-47). The summary judgment evidence establishes the following:

On April 13, 2013, Plaintiff was "having a visit with a loved one at the McConnell Unit." (*See* D.E. 24, p. 3, Plaintiff's First Amended Complaint). On that same day, the McConnell Unit Interdiction Team received information from a Confidential Informant (CI) that Plaintiff and another inmate, Offender Hector Garcia, had conspired to obtain illegal narcotics during a contact visitation scheduled for that day. (*See* D.E. 36-2, p. 5, Statement of Warden Curry; D.E. 36-2, p. 18, Statement of Captain Rodriguez; and D.E. 36-2, p. 19; Statement of Lieutenant Mireles). Based on this information, using camera surveillance, Captain Rodriguez and Lieutenant Mireles monitored the actions of Plaintiff and Offender Garcia as they met with their met with their visitors. *Id.* at 5, 18, 19. Prior to entering the visitation area, Plaintiff's visitor, Carmel Badillo, and Offender Garcia's visitor, Lupe Mejia, were observed talking to each other directly outside the door to the inside visitation area. *Id.* at 5. During the actual visitation, Captain Rodriguez and Lieutenant Mireles each observed Lupe Mejia reach into her blouse and then discreetly pass an object to Offender Garcia, who placed the object in his mouth and appeared to

ingest it. *Id.* at 18, 19. The officers observed Offender Garcia ingest objects a total of eight times. *Id.* Captain Rodriguez and Lieutenant Mireles also watched Plaintiff and his visitor and characterized their behavior as serving as "look outs." *Id.* at 5. In addition, they observed Plaintiff take a small object from Carmel Badillo and place it in his mouth. *Id.* at 18, 19. Based on the information provided by the CI and the behavior observed during the visitation, Captain Rodriguez and Lieutenant Mireles suspected that Plaintiff had ingested illegal contraband. *Id.* at 18, 19. At the conclusion of the visitation period, Plaintiff and Offender Garcia were apprehended and escorted to the infirmary to be placed in dry cell isolation for purposes of collecting their bodily waste for inspection of contraband. *Id.* Warden Barber approved this action. (D.E. 1, p. 4).

At the infirmary, Plaintiff was ordered to remove all of his clothing, given a paper gown to wear, and placed in a cell "that is used for suicidal inmates." (D.E. 1, p. 4). Plaintiff was not provided with a mattress or blanket, and he was given only prunes and peanut butter sandwiches to eat. *Id.* at p. 6. He was not given any personal hygiene products, including toilet paper. *Id.*

The next day, Warden Monroe came to Plaintiff's cell and informed him that he would be transferred to a free world hospital for an x-ray of his stomach to search for contraband. (D.E. 24, p. 3). Warden Monroe questioned Plaintiff as to why he was refusing to eat, and Plaintiff responded that he was allergic to peanut butter. Plaintiff asked for clothing because the dry isolation cell was extremely cold and Plaintiff had only the paper gown to wear. *Id.* at 4. Warden Monroe indicated that he could do no more for Plaintiff and that he would be alright. *Id.*

On April 14, 2013, Plaintiff's stomach was x-rayed at a free world hospital, and it was negative for contraband. (D.E. 24, p. 40).

On April 15, 2013, at the McConnell Unit infirmary, Plaintiff underwent a second x-ray of his stomach, and it was also negative for any foreign object or contraband. (D.E. 24, p. 40).

After the second x-ray, Wardens Currie, Monroe and Barber, together with two majors that are not defendants in this lawsuit, came to Plaintiff's dry cell and questioned him about smuggling narcotics into the prison. (D.E. 24, p. 4). Plaintiff denied any knowledge of drug smuggling. *Id.* While there, the warden Defendants had the opportunity to observe the conditions in which Plaintiff was being held, that he had no "mattress, blanket, basic items of hygiene, adequate clothing or drinking water." *Id.* Despite observing these conditions, the wardens took no action to assist Plaintiff. *Id.*

Later that afternoon, Lieutenant Mireles met with Plaintiff in the dry cell and questioned him about smuggling drugs into the McConnell Unit. (D.E. 24, p. 5). Again, Plaintiff denied having any knowledge of smuggling activities. *Id.* Shortly thereafter, Captain Rodriguez arrived and questioned Plaintiff regarding "what he had done with the dope." *Id.* Plaintiff denied knowledge of any narcotics. *Id.* Plaintiff asked Captain Rodriguez when he would be permitted to leave the dry cell and Captain Rodriguez responded, "when I get ready." *Id.*

Plaintiff had two bowel movements on April 15, 2013. The feces were inspected and no contraband was found.

Eight balloons were found in the stool samples of Offender Garcia. (D.E. 36-2, p. 7). However, the contents of the balloons were destroyed. *Id.* In an interview with Lieutenant Hinojosa (not a defendant), Offender Garcia related that the balloons had contained methamphetamine and heroin. (D.E. 36-2, p. 30). Based on his admission, Offender Garcia was charged with Possession of Unauthorized Drugs, a Level 1 Offense. (D.E. 36-2, p. 6; D.E. 36-2, pp. 30-31). In addition, Lupe Mejia was removed from Offender Garcia's visitation list. (D.E. 36-2, p. 6). Because no drugs were found in Plaintiff's stool sample and he denied any involvement with Offender Garcia, he was not charged with a disciplinary offense. (D.E. 36-2, p. 6). However, Plaintiff was not returned to his cell, but instead, was held in "punitive segregation" for the next thirty-eight (38) days with no charges filed against him.

Plaintiff maintains that Defendants violated his due process rights when they ordered him held in dry cell isolation for almost two days, and then punitive segregation for an additional thirty-eight days without being charged with an offense. He claims further that the conditions of his confinement in the dry cell isolation were in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.

**IV. Summary judgment standard.**

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence, or evaluate the credibility of witnesses. *Id.* Furthermore, "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see also Cormier v. Pennzoil Exploration & Prod. Co.*, 969 F.2d 1559, 1561 (5th Cir. 1992) (per curiam) (refusing to consider affidavits that relied on hearsay statements); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam) (stating that courts cannot consider hearsay evidence in affidavits and depositions). Unauthenticated and unverified documents do not constitute proper summary judgment evidence. *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To sustain this burden, the nonmoving party cannot rest on the mere allegations of the pleadings. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S.

at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "If reasonable minds could differ as to the import of the evidence ... a verdict should not be directed." *Anderson*, 477 U.S. at 250-51.

The evidence must be evaluated under the summary judgment standard to determine whether the moving party has shown the absence of a genuine issue of material fact. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

## V. Discussion.

### A. 42 U.S.C. § 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *Nelson v. Campbell*, 541 U.S. 637, 643 (2004). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48 (1988). A defendant acts under color of state law if he misuses or abuses official power and if there is a nexus between the victim, the improper conduct, and the defendant's performance of official duties. *Townsend v. Moya*, 291 F.3d 859, 861 (5th Cir. 2002).

"Personal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983). There is no vicarious or *respondeat superior* liability of supervisors under section 1983. *Thompkins v. Belt,* 828

F.2d 298, 303-04 (5th Cir. 1987). *See also Carnaby v. City of Houston,* 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials). For a supervisor to be liable under § 1983, the plaintiff must show that (1) the supervisor failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the constitutional violation; and (3) the failure to train or supervise amounts to deliberate indifference to the plaintiff's constitutional rights. *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). Establishing a supervisor's deliberate indifference generally requires a plaintiff to demonstrate "at least a pattern of similar violations." *Rios v. City of Del Rio, Tex.,* 444 F.3d 417, 427 (5th Cir. 2006) (citations omitted).

**B. Eleventh Amendment immunity.**

Plaintiff has sued Defendants in their official and individual capacities for monetary damages as well as for injunctive and declaratory relief. (*See* D.E. 24, p. 7). Defendants move to dismiss Plaintiff's claims for money damages against them in their official capacities as barred by the Eleventh Amendment. (D.E. 36, p. 4).

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state…." Const. Amend. XI. This withdrawal of jurisdiction effectively confers an immunity from suit. *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy,* 506 U.S. 139, 144 (1993). As such, the Supreme Court has consistently held that an unconsenting State "is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Id.* (citation omitted).

*See also Frew v. Hawkins,* 540 U.S. 431, 437 (2004) (the Eleventh Amendment confirms the sovereign status of States by shielding them from suits by individuals, absent their consent); *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670 (1999) (acknowledging that individuals are permitted to sue a State if the State consents, or Congress abrogates the State's sovereign immunity pursuant to the Fourteenth Amendment).

When a plaintiff files suit against state officials in their official capacities, the lawsuit is effectively one against the State. *Hafer v. Melo,* 502 U.S. 21, 25 (1991). Indeed, a claim for monetary damages against a state official in his or her official capacity is "no different from a suit against the state itself," and consequently, is barred by the Eleventh Amendment.[2] *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 (1989). *See also McKinley v. Abbott,* 643 F.3d 403, 406 (5th Cir.), *cert. denied,* 132 S. Ct. 825 (2011) ("Eleventh Amendment immunity extends to state officials who are sued in their official capacities because such a suit is actually one against the state itself."). Indeed, the Fifth Circuit has repeatedly held that the Eleventh Amendment bars claims for money damages against TDCJ officers in their official capacities. *See e.g., Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

---

[2] The Eleventh Amendment does not bar a plaintiff's claim for prospective injunctive relief. *Ex parte Young,* 209 U.S. 123, 159 (1908) (establishing exception to Eleventh Amendment immunity in cases where the alleged constitutional violation is caused by a state official's actions or refusal to act within the authority of his or her office). *See also Will,* 491 U.S. at 71, n. 10 (noting that official-capacity actions for prospective relief are not treated as actions against the State).

To the extent Plaintiff is suing the Defendants in their official capacities for money damages, those claims are barred by the Eleventh Amendment. *See Frew*, 540 U.S. at 437. Therefore, it is respectfully recommended that Defendants' motion for summary judgment to dismiss Plaintiff's monetary claims against them in their official capacities be granted, and those claims dismissed with prejudice as barred by the Eleventh Amendment.

**C. Qualified immunity.**

Defendants move for summary judgment to dismiss Plaintiff's claims on the grounds that his allegations fail to state cognizable constitutional violations and, even if they did, Defendants are entitled to qualified immunity and therefore not subject to suit. (D.E. 36, pp. 6-8). *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) ("The [qualified immunity] entitlement is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.") (emphasis in original).

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant invokes the defense of qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc). To discharge this burden, the plaintiff must satisfy a two-prong test." *Atteberry v .Nocana*

*Gen. Hosp.*, 430 F.3d 245, 251-52 (5th Cir. 2005). First the plaintiff must claim that the defendants committed a constitutional violation under current law. *Id.* (citation omitted). Second, the plaintiff must claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. *Id.*

While it will often be appropriate to conduct the qualified immunity analysis by first determining whether a constitutional violation occurred and then determining whether the constitutional right was clearly established, that ordering of the analytical steps is no longer mandatory. *Pearson*, 555 U.S. at 236 (receding from *Saucier v. Katz*, 533 U.S. 194 (2001)).

**Step 1: Violations of a constitutional right.**

**(1) Due process violations.**

**(a) Dry cell isolation.**

Plaintiff claims that his due process rights were violated when he was placed in dry cell isolation without formal charges brought against him or a hearing to contest those charges.

Generally speaking, due process protections attach only to those punishments that impose an atypical and significant hardship in relation to ordinary incident of prison life, or to those that extend the length or duration of confinement. *Sandin v. Conner*, 515 U.S. 472, 484-86 (1995). The Fifth Circuit has held that "administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest." *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir.1996) (quoting *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir.1995)). Furthermore, the protections afforded by the Due

Process Clause do not extend to "every change in the conditions of confinement" which are adverse to a prisoner. *Madison v. Parker*, 104 F.3d 765, 767-68 (5th Cir.1997). Only when a prisoner demonstrates "extraordinary circumstances" may he maintain a due process challenge to a change in his custodial classification. *Sandin*, 515 U.S. at 484.

Cases where segregated confinement is sufficiently atypical to implicate a due process liberty interest involve circumstances that are much harsher than those presented here. For example, in *Wilkerson v. Stalder*, 329 F.3d 431 (5th Cir. 2003), the Fifth Circuit held that due process ***might*** have been violated where the plaintiff had been kept on lockdown status for thirty years. *Id.*, 329 F.3d at 436 (remanding for determination whether such confinement was "atypical" under *Sandin*). In another case, the Supreme Court held that transfer to the Ohio "Supermax" facility implicated a liberty interest, in part because the conditions there were "more restrictive than any other form of incarceration in Ohio." *Wilkinson v. Austin*, 545 U.S. 209, 214 (2005). The *Wilkinson* Court noted that at the Supermax facility, "almost all human contact is prohibited." *Id.* at 223. Ohio Supermax prisoners are kept in single cells with solid metal doors that prevent communication from one cell to another; prisoners take all their meals alone in their cells rather than a common area; and "opportunities for visitation are rare" and are conducted through glass walls. *Id.* at 223-24. Ohio Supermax inmates spend 23 hours a day alone in their cells, where a light remains on at all times. *Id.* at 224. Moreover, confinement at the Supermax facility is indefinite, and otherwise eligible inmates are disqualified for parole consideration. *Id.* These conditions and others were sufficiently extraordinary

that the Supreme Court concluded prisoners had a liberty interest in avoiding assignment to the Supermax facility. *Id.*

The thirty-year confinement and extreme conditions in *Wilkinson* are distinguishable from the present facts. Plaintiff was held in dry cell isolation for approximately 48 hours in order for prison officials to collect a stool sample. Defendants' decision to place plaintiff in the dry cell was premised on: (1) the report of the CI; the observations of Captain Benavidez and Lieutenant Mireles of Plaintiff's conduct in the visitation room on April 13, 2013; and (3) Offender Garcia's implication of Plaintiff in the smuggling operation. Defendants did not violate Plaintiff's due process rights when they held him in dry cell isolation for two days to investigate possible contraband smuggling into the prison.

**(b) Punitive segregation.**

Following the dry isolation cell, Plaintiff was held in punitive segregation, for thirty-eight days without a disciplinary hearing. Although the action taken by Defendants was clearly punitive, it similarly did not "present a dramatic departure from the basic conditions" of his sentence. *Sandin* makes clear that no particular process is required for punishment that affects only the *quality* of the confinement rather than the *quantity* of confinement. *Id.* Atypical and significant hardships are those deprivations which "clearly impinge on the duration of confinement." *Orellana v. Kyle*, 65 F.3d 29, 31-32 (5th Cir. 1995) (quoting *Sandin*, 515 U.S. at 483-84). Plaintiff has failed to make any showing that the time spent in solitary confinement extended his total time in prison or otherwise resulted in "atypical, significant hardships," and his mere placement in

segregation fails to state a cognizable due process claim. *See e.g. Samford v. Staples*, 249 Fed. Appx. 1001, 1004 (5th Cir. 2007) (temporary solitary confinement, disciplinary sanctions of curtailed recreation and commissary privileges, assignment of extra duty, and a reduction in his classification status did not represent atypical or significant hardships and did not infringe upon a constitutionally protected liberty interest); *Clark v. Stalder*, 103 F.3d 126 (5th Cir. 1996) (unpublished) (citing *Bulger v. U.S. Bureau of Prisons*, 65 F.3d 48, 49 (5th Cir. 1995) ("prison classification and eligibility for rehabilitation programs are not directly subject to 'due process' protections"). Plaintiff's allegations fail to raise cognizable due process claims.

**(2) Eighth Amendment.**

Plaintiff claims that the conditions in the dry cell isolation violated the Eighth Amendment. He claims that he was denied a mattress, blanket, proper food, water, and necessary personal hygiene materials for the 44 hours he was held there.

The Eighth Amendment prohibits cruel and unusual punishment. U.S. Const. amend. VIII. Prison officials must provide humane conditions of confinement; ensure that inmates receive adequate food, clothing, shelter, and medical care; and take reasonable measures to guarantee the safety of the inmates. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Conditions that result in "unquestioned and serious deprivations of basic human needs" or "deprive inmates of the minimal civilized measure of life's necessities" violate the Eighth Amendment. *Hudson v. McMillian*, 503 U.S. 1, 8-10 (1992); *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

The Supreme Court has developed a two-part analysis to govern Eighth Amendment challenges to conditions of confinement. First, under the "objective component," a prisoner must prove that the condition he complains of is sufficiently serious to violate the Eighth Amendment. *Hudson*, 503 U.S. at 8. The challenged condition must be "extreme." Id. at 9. While an inmate "need not await a tragic event" before seeking relief," *Helling v. McKinney*, 509 U.S. 25, 33 (1993), he must at the very least show that a condition of his confinement "pose[s] an unreasonable risk of serious damage to his future health" or safety. *Id.* at 35. Moreover, the Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury will actually be caused by exposure to [the challenged condition of confinement]. *Id.* It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwilling to such a risk. *Id.* In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate. *Id.* at 36. The Eighth Amendment thus guarantees that prisoners will not be "deprive[d] ... of the minimal civilized measure of life's necessities." *Rhodes*, 452U.S. at 347.

Second, the prisoner must show that the defendant prison officials "acted with a sufficiently culpable state of mind" with regard to the condition at issue. *Hudson*, 503 U.S. at 8. The proper standard is that of deliberate indifference. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Negligence does not suffice to satisfy this standard, *id.* at 305, but a prisoner need not show that the prison official acted with "the very purpose of causing

harm or with knowledge that harm would result." *Farmer*, 511 U.S. at 835. In defining the deliberate indifference standard, the Farmer Court stated:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837. Furthermore, the official may escape liability for known risks "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

The TDCJ-CID has a legitimate penological interest in curtailing the influx of illicit drugs into its prisons, and to that end, it has established "Dry Cell Isolation Procedures" to be employed when a prisoner is suspected of ingesting contraband. (*See* D.E. 36-2, pp. 35-40). The purpose of placing an offender in dry cell isolation is "to eliminate opportunities for the offender to destroy the contraband by flushing it down the toilet." *Id.* at 37. Offenders are strip searched and issued "a paper gown, mattress, and a sheet." *Id.* Any water to the cell is turned off. *Id.* The offender is to be provided "meals consistent with the meals served in the dining hall" and adequate drinking water. *Id.*

Plaintiff objects to the fact that he was given a paper gown to wear, but the TDCJ has adopted the paper gown as part of its approved dry cell policy, and it does not shock the conscience that an inmate suspected of ingesting contraband would be placed in dry cell isolation. Plaintiff also complains that he did not receive a mattress or sheet, that Defendants were aware of this fact, and yet they ignored the dry cell policy and did not

provide him with these "necessities." However, the fact that Defendants may have violated TDCJ policy in and of itself does not equate with a constitutional violation. *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (prison's failure to follow its own rules and regulations, without more, does not state a constitutional violation). Moreover, taking Plaintiff's allegations as true, the fact that he was cold and uncomfortable for forty-four hours while held in dry cell isolation upon suspicion of contraband smuggling does not shock the conscience of mankind or equate to a denial of the minimal civilized necessities of life. *See Davis v. Scott*, 157 F.3d 1003, 1007 (5th Cir. 1998) (no Eighth Amendment violation where offender confined for three days in crisis management cell with blood on walls and excretion on floor). *See also Hutto v. Finney*, 437 U.S. 678, 686-87 ("the length of confinement cannot be ignored. … A filthy overcrowded cell … might be tolerable for a few days and intolerably cruel for weeks or months.").

Plaintiff's placement in the dry cell did not violate the Eighth Amendment.

**Step 2 – Objective reasonableness.**

Because Plaintiff has failed to state cognizable due process or Eighth Amendment claims, the Court need not examine whether the Defendants' actions were objectively reasonable. *See Saucier*, 533 U.S. at 201 (if the facts alleged do not establish that the officer's conduct violated a constitutional right, then the qualified immunity analysis need proceed no further and qualified immunity is appropriate).

## VI. Conclusion.

Defendants have demonstrated that there is no genuine issue of a material fact that they did not violate Plaintiff's due process or Eighth Amendment rights by placing him in

dry cell isolation for two days without a mattress or sheet, nor when they held him for an additional thirty–eight days in punitive segregation. Accordingly, it is respectfully recommended that the Court grant Defendants' motion for summary judgment (D.E. 36) and dismiss with prejudice Plaintiff's claims.

Respectfully submitted this 12th day of August, 2014.

B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United* Servs. *Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996)(en banc).